# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
)
Kellogg Brown & Root Services, Inc. ) ASBCA Nos. 59357, 59358
)
Under Contract No. DACA63-03-D-0005 )

APPEARANCES FOR THE APPELLANT: Kurt J. Hamrock, Esq.
Herbert L. Fenster, Esq.
Raymond B. Biagini, Esq.
Covington & Burling LLP
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
Engineer Chief Trial Attorney
Michaele J. Mandulak, Esq.
Engineer Trial Attorney

Raymond M. Saunders, Esq.
Army Chief Trial Attorney
Kyle E. Chadwick, Esq.
Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE DELMAN ON APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Kellogg Brown & Root Services, Inc. (KBRSI or appellant)[1] has filed a motion for partial summary judgment under ASBCA Nos. 59357 and 59358, contending that under its contract with the government it is entitled to be indemnified against certain third-party claims and for the legal costs it has incurred in defending these claims. The government opposes partial summary judgment, contending that the government has no such contractual obligation under the circumstances. We have jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1. In the run-up to "Operation Iraqi Freedom" and the invasion of Iraq in 2003, the Secretary of Defense designated the U.S. Army Corps of Engineers

---

[1] The contract and the related task order were issued to "Brown & Root Services, A Division of Kellogg Brown & Root," which later became KBRSI. For ease of reference, we refer to KBRSI as the contractor/appellant in this opinion.

("government") as the executive agent for Iraqi restoration. Insofar as pertinent here, the government established a "Task Force Restore Iraqi Oil" as the planning and executive organization for management and operations to restore Iraq's oil production as a result of the war and its aftermath. (R4, vol. 1, tab C1 at 101)

2. In response to the government's requirements under its Logistics Civil Augmentation Program (LOGCAP) contract, appellant developed a contingency support plan (CSP), dated 31 January 2003, to assess damage, repair, maintenance, and the resumption and/or continuity of operations of the oil infrastructure of Iraq during a possible military occupation of Iraq (R4, vol. 4, tab D at 2). Following its receipt of the CSP, the government approached appellant with respect to the performance of a contract to execute the CSP and to perform oil field-related and support services.

3. On 3 March 2003, appellant sent a request to the government seeking indemnification coverage under "Public Law 85-804" for unusually hazardous risks associated with the performance of any such contract (R4, vol. 1, tab C1 at 065). Public Law No. 85-804, 72 Stat. 972, signed into law on 28 August 1958, empowered the President to authorize executive agencies to enter into, amend or modify government contracts without regard to other provisions of law when necessary to facilitate the national defense. Acting under this authority, President Eisenhower on 14 November 1958 issued Executive Order (EO) 10789, "Authorizing Agencies of the Government To Exercise Certain Contracting Authority in Connection With National-Defense Functions and Prescribing Regulations Governing the Exercise of Such Authority." In summary, Paragraph 1 of this EO authorized the Department of Defense and the service branches, "within the limits of the amounts appropriated and the contract authorization provided therefor," to enter into, amend, modify or make advance payments on government contracts when necessary to facilitate the national defense. 23 Fed. Reg. 8897; *see* EO 10789 *following* 50 U.S.C. § 1431. (App. supp. br. at 2)

4. On 22 July 1971, President Nixon issued EO 11610, which amended and expanded EO 10789 by adding Paragraph 1A. Insofar as pertinent, Paragraph 1A provided as follows:

> 1A. (a) The limitation in paragraph 1 to amounts appropriated and the contract authorization provided therefor shall not apply to **contractual provisions which provide that the United States will hold harmless and indemnify the contractor against any of the claims or losses set forth in subparagraph (b), whether resulting from the negligence or wrongful act or omission of the contractor or otherwise (except as provided in subparagraph (b)(2)).** This exception from the

2

limitations of paragraph 1 shall apply only to claims or losses arising out of or resulting from risks that the contract defines as unusually hazardous or nuclear in nature....

(b)(1) Subparagraph (a) shall apply to claims (including reasonable expenses of litigation and settlement) or losses, not compensated by insurance or otherwise, of the following types:

(A) Claims by third persons, including employees of the contractor, for death, personal injury, or loss of, damage to, or loss of use of property;

....

(2) **Indemnification and hold harmless agreements** entered into pursuant to this subsection, whether between the United States and a contractor, or between a contractor and a subcontractor, or between two subcontractors, **shall not cover claims or losses caused by the willful misconduct or lack of good faith on the part of any of the contractor's or subcontractor's directors or officers or principal officials which are (i) claims by the United States (other than those arising through subrogation) against the contractor or subcontractor, or (ii) losses affecting the property of such contractor or subcontractor**. Regulations to be prescribed or approved by the Secretaries of Defense, the Army, the Navy or the Air Force shall define the scope of the term "principal officials." [Emphasis added]

36 Fed. Reg. 13755; *see* EO 10789 *following* 50 U.S.C. § 1431.

5. The government issued a determinations and findings (DAF) in support of appellant's indemnification request, entitled: "DETERMINATIONS AND FINDINGS OF THE CONTRACTING OFFICER CONCERNING THE REQUEST FOR INDEMNIFICATION SUBMITTED BY [APPELLANT] RELATING TO THE CONTRACT TO EXECUTE A CONTINGENCY SUPPORT PLAN FOR THE RESTORATION AND OPERATION OF THE IRAQI OIL INFRASTRUCTURE." Insofar as pertinent, this DAF provided as follows:

3

**2. Definition of unusually hazardous risks and statement that parties to the contract have agreed concerning those risks.**

**a. Definition of unusually hazardous risks.**

This is an unprecedented contract for an unprecedented situation. The risks associated with this contract are extraordinarily high. The extent of damage that may be done to Iraq's oil infrastructure and other related infrastructure remains unknown. Technical risks are extraordinarily high. The Contractor must quickly assess the condition of the facilities. Then he must quickly make repairs to the Iraqi energy infrastructure and all related systems and facilities, including but not limited to...water, pipeline distribution systems, and supporting electrical grids in an austere environment without sufficient time to evaluate the situation thoroughly. As a result, there is significant risk that actions taken by the contractor, particularly in the first few weeks after the conflict begins will be less than optimum.

....

...Although the contract contemplates that CENTCOM will provide a "benign" environment, there will be many unusual and extraordinary hazards in the area. These may include, but are not limited to, indirect fire; booby traps; biological and chemical agents, which may be persistent; suicide bombers; hazards caused or increased by the deteriorated condition of the Iraqi infrastructure and lack of instrumentation on the facilities; and environmental hazards....

Finally, even successful operations on a scale of the one envisioned here are likely to result in contamination of fresh water zones both on and beneath the surface and may result in other environmental pollution.

(Appellant's Statement of Undisputed Material Facts (ASUMF), attach. 3 at 9, 12-13) This DAF was signed by the contracting officer (CO) and other government officials between 5 March and 6 March 2003 (*id.* at 18).

4

6. On 8 March 2003, the government awarded to appellant Contract No. DACA63-03-D-0005. This cost-reimbursement, indefinite delivery, indefinite quantity contract had a base period of two years and three one-year options, not to exceed a total of five years. The government's minimum guarantee for the contract was $500,000 and the estimated maximum amount was $7 billion. (R4, vol. 1, tab B at 1-3)

7. By Memorandum of Decision dated 19 March 2003 ("White Memo"), the Secretary of the Army authorized the inclusion of the Indemnification clause into the contract, Federal Acquisition Regulation (FAR) 52.250-1, Alternate I. In brief, this clause provided for indemnification of appellant for certain losses arising out of or resulting from a risk defined in the contract as "unusually hazardous." Enclosure A to the White Memo defined "unusually hazardous risks" as follows:

ENCLOSURE A

DEFINITION OF UNUSUALLY HAZARDOUS RISKS

The definition of the unusually hazardous risks to which the contract indemnification clause will apply is as follows:

"The risk of

-fire, explosion, combustion or detonation of hydrocarbons or other combustible substances, or of munitions, explosives, pyrotechnics and ordnance of all types, whether military or nonmilitary;

-exposure to lethal chemical agents, biological agents, radioactivity or nuclear materials. The term "lethal chemical agents" for the purposes of this clause, means: (i) the agents GB, VX or mustard, (ii) any other military chemical agent encountered at the work site, or (iii) any other highly toxic, carcinogenic, mutagenic, teratogenic or psychotropic chemical resulting from a reaction with the items listed in (i) or (ii) above;

-sudden or **nonsudden release of** hydrocarbons or other **toxic or hazardous substances or contaminants into the environment,** including subsurface release;

-failure of equipment or failure to control a wild well...." [Emphasis added]

(ASUMF, attach. 3 at 2-4)

8. The Indemnification clause, the White Memo and Enclosure A were incorporated into the contract under Modification No. P00002, effective 20 March 2003 (R4, vol. 1, tab B at 126-29). The Indemnification clause is appended as an appendix to this opinion.

9. Pursuant to the contract, the government issued Task Order No. 0003 to appellant on 20 March 2003 (R4, vol. 1, tab B at 139-52). Task Order No. 0003, as modified by Amendment No. 03 dated 30 April 2003, tasked the contractor to "provide the necessary equipment, tools, materials and personnel to perform and complete repairs on oil wells...pipelines, pump stations...and other associated infrastructure which are necessary to...restore the facilities to operating condition" (*id.* at 138). The Task Order also provided: "[C]ontractor personnel shall be notified by ACO that benign conditions exist [2] and directed by the ACO to deploy from staging areas...to specific facilities" (*id.* at 140).

10. One facility to which appellant was directed under Task Order No. 0003 was the Qarmat Water Treatment Plant (the "plant") near Al Basrah, Iraq. Simply stated, this plant provided chemically-treated water that was distributed to pumping stations which was then injected under pressure into nearby Iraqi oil fields to allow for the oil and gas to rise, thereby facilitating extraction. (R4, vol. 2, tab C1 at 1283) The operations at this plant had become degraded and needed to be restored as a link to the restoration of Iraqi oil production (compl. ¶ 19, answer ¶ 19).

11. Because of the ongoing dangerous conditions in Iraq, and as required by the contract, the government provided uniformed U.S. military personnel as force protection to KBRSI personnel while traveling throughout the war theater and while performing work at Iraqi oil infrastructure facilities, including the subject plant (compl. ¶ 18, answer ¶ 18).

12. It is undisputed that in the spring of 2003 and beyond, there were persons at the plant who were exposed by touch or inhalation to a chemical agent in powder form known as "Sodium Dichromate," which was found in the soil and in other areas of the

_____

[2] The parties dispute the nature and extent of the government's responsibility to provide "benign conditions" to Iraqi sites under Task Order No. 0003. However, this dispute is unrelated to the interpretation of the Indemnification clause, and hence is not a relevant, material dispute that would preclude consideration of appellant's motion.

plant. It is also undisputed that in or around the summer of 2003, appellant took action to encapsulate the Sodium Dichromate at certain plant locations, and that later in the year plant operations were shut down for a period of time due to personnel exposure and related testing. (R4, vol. 2, tab C1 at 1319-22, vol. 11, tab H at 2899, 2907)

13. According to "Memorandum for Surgeon General of the Army from Defense Health Board" dated 10 December 2008, Sodium Dichromate is "a corrosion suppression agent used in the water treatment process." It is "an inorganic compound containing hexavalent chromium known to be toxic and carcinogenic to humans and animals." (App. supp. R4, tab J-15 at 105) Sodium Dichromate is also classified as a hazardous substance under regulations implementing the Federal Water Pollution Control Act. 40 C.F.R. § 116.4.

Sodium Dichromate Legal Actions Against Appellant[3]

14. In 2005, former KBRSI personnel sought through arbitration to recover from KBRSI for injuries allegedly caused by Sodium Dichromate exposure at the Qarmat plant. *See Langford v. Halliburton*, AAA No. 704800064905. The government reimbursed KBRSI for the legal costs it incurred in successfully defending the *Langford* arbitration.

15. Beginning in December 2008, various groups of U.S. and British military personnel filed claims against KBRSI in federal court, alleging that these individuals had provided force protection for KBRSI personnel or perimeter security at the plant in 2003 and had been exposed to injurious levels of Sodium Dichromate due to appellant's negligence and wrongdoing.

16. The first claim brought by military personnel in federal court was *McManaway v. KBR Inc.* (Southern District of Indiana), which was filed in late 2008 on behalf of a group of Indiana National Guard personnel. Throughout 2009, KBRSI was named by military personnel in several additional lawsuits in federal court: *Bixby v. KBR Inc.* (District of Oregon); *Billiter v. Kellogg, Brown & Root Services, Inc.* (Northern District of West Virginia); *Gallaher v. KBR Inc.* (Northern District of West Virginia); and *Bootay v. KBR Inc.* (Western District of Pennsylvania). KBRSI notified the government of the lawsuits brought against it and requested assistance and direction as to the management or disposition of the suits. The government acknowledged receipt of these litigation notices, but stated in response that it was the policy of the Army to remain neutral in the litigation.

---

[3] SOF ¶¶ 14-18 are based upon ASUMF ¶¶ 20-25. The government has accepted the factual assertions in the ASUMF, except for ASUMF ¶ 18 (gov't opp'n at 3).

17. KBRSI defended these lawsuits and obtained dismissals in *McManaway, Billiter, Gallaher,* and *Bootay.* After the above dismissal, the McManaway plaintiffs filed a similar action in 2011 in the U.S. District Court, Southern District of Texas, and as far as this record shows, this action is currently pending.

18. In October 2012, following a jury trial in *Bixby,* the jury returned an $85.2 million verdict, including compensatory and punitive damages, against KBRSI and other defendants. On remittitur, the court reduced the jury's verdict to an $81 million judgment. KBRSI appealed.

19. On appeal, the Ninth Circuit vacated the judgment and reversed and remanded, holding that the defendants were not subject to personal jurisdiction in Oregon for actions performed in Iraq. *Bixby v. KBR, Inc.; Kellogg, Brown & Root Service, Inc.,* 603 F. Appx. 605 (9th Cir. 2015).

### KBRSI Requests Indemnification from the Government

20. Throughout the above period, KBRSI notified the government of the ongoing legal matters and the concomitant legal costs it was incurring (compl. ¶ 87, answer ¶ 87). By letter to the CO dated 29 December 2010, KBRSI requested that the government acknowledge its indemnification obligations under the contract and participate directly in the pending lawsuits (app. supp. R4, tab J-16 at 117-24).

21. By letter to KBRSI dated 6 April 2011, the CO denied the indemnification request (R4, vol. 1, tab C1 at 449-50). KBRSI submitted additional information to the government, and the parties met in August 2011 to further discuss this matter. By letter to KBRSI dated 18 November 2011, the CO again denied KBRSI's indemnification request (R4, vol. 2, tab C1 at 1256-57).

22. In July and August 2012, KBRSI submitted to the government invoices for payment of some of the outside legal costs incurred to defend against these third-party lawsuits (compl. ¶ 47, answer ¶ 47). The government did not pay these invoices (compl. ¶ 49, answer ¶ 49).

23. KBRSI thereafter submitted three certified claims to the government, dated 21 December 2012, 21 February 2013 and 4 April 2014, seeking payment for the unpaid invoices and additional legal costs related to the Sodium Dichromate claims, totaling over $30 million (R4, tabs C1, C2, C3). The government declined to issue a CO decision on any of these claims.

24. Appellant appealed to this Board based upon the deemed denial of its claims. The deemed denial of the certified claim of 21 December 2012, as updated by the claim of 21 February 2013, was docketed as ASBCA No. 59357. The deemed

denial of the claim dated 4 April 2014 was docketed as ASBCA No. 59358. The appeals were consolidated and pleadings were filed.

25. On 23 December 2014, appellant filed the subject motion for partial summary judgment under ASBCA Nos. 59357 and 59358.[4] Appellant sought judgment under Count III of its complaint, which alleged entitlement to indemnification pursuant to Public Law No. 85-804 and the Indemnification clause.

26. On 28 July 2014, appellant filed another certified claim with the CO, seeking an additional $488,309.83, plus interest, under the Indemnification clause for costs incurred to defend certain Sodium Dichromate matters (ASBCA No. 59873, compl., ex. A at 26). By decision dated 10 December 2014, the CO denied this claim (*id.*, ex. B). Appellant appealed to this Board, and the appeal was docketed as ASBCA No. 59873. Per appellant's request and without objection from the government, the three appeals were consolidated and further proceedings under ASBCA No. 59873 were stayed pending resolution of the dispositive motions in ASBCA Nos. 59357 and 59358.

## DECISION

Under appellant's motion for partial summary judgment we are asked to interpret the parties' contract, specifically, the Indemnification clause, FAR 52.250-1, Alternate I, and the related White Memo and its Enclosure A that were made part of the contract under Modification No. P00002. "Contract interpretation begins with the plain language of the written agreement." *McHugh v. DLT Solutions, Inc.*, 618 F.3d 1375, 1380 (Fed. Cir. 2010). We seek an interpretation of FAR clauses/regulations consistent with the plain terms provided; it is not our prerogative to insert words or phrases to alter an otherwise plain and clear meaning. *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346-47 (Fed. Cir. 2005); *Northrop Grumman Corp.*, ASBCA No. 57625, 14-1 BCA ¶ 35,501, *recon. denied*, 14-1 BCA ¶ 35,743. Contract interpretation is a question of law and may be resolved by summary judgment if the provisions are unambiguous. *Skanska US Building, Inc.*, ASBCA No. 56339, 10-1 BCA ¶ 34,392 at 169,832.

The Indemnification clause, Paragraph (b), states in part as follows:

> Under Public Law 85-804 (50 U.S.C. 1431-1435) and
> Executive Order 10789, as amended, and regardless of any
> other provisions of this contract, the Government shall,

---

[4] Appellant had earlier filed a motion for judgment on the pleadings under ASBCA Nos. 59357 and 59358.

9

> subject to the limitations contained in the other paragraphs
> of this clause, indemnify the Contractor....

We address below whether appellant has met the requirements for indemnification as prescribed by this clause.

<u>Per Paragraphs (b) and (c) of the Indemnification Clause, the Third-Party Claims and Related Costs "Arise[s] Out of or Result[s] from" a Risk Defined in the Contract as Unusually Hazardous and Are "Not Compensated for by Insurance or Otherwise."</u>

By its very terms, Paragraph (b)(1) of the Indemnification clause covers the type of loss, i.e., litigation expense and personal injury claims, for which appellant seeks indemnification here. Under Paragraph (c) of the Indemnification clause, the government agreed to indemnify appellant for such loss that "arises out of or results from a risk defined in this contract as unusually hazardous" and was "not compensated for by insurance or otherwise."

"Unusually hazardous" risks are defined in "Enclosure A" of the White Memo, which was made part of the contract under Modification No. P00002. One such risk was defined as the "nonsudden release" of a "toxic or hazardous substance."

Sodium Dichromate contains hexavalent chromium, a toxic and carcinogenic substance. It is also classified as a hazardous substance under regulations implementing the Federal Water Pollution Control Act. (SOF ¶ 13) Indeed, it is undisputed that appellant took action to encapsulate the Sodium Dichromate powder at the plant in or around the summer of 2003, and that later in the year the plant was shut down for a period of time due to personnel exposure and related testing. We believe that Sodium Dichromate is a "toxic or hazardous substance" in accordance with the plain meaning of the term and in accordance with Enclosure A of the White Memo in the contract.

The parties' motion papers do not dispute the meaning of the term "nonsudden release" and do not dispute the application of the term to the Sodium Dichromate exposure in this case. The Army has defined "non-sudden release" of an agent in an indemnification context under Public Law No. 85-804 as a release of toxic material "which takes place over time and involves continuous or repeated exposure." Mark J. Connor, *Government Owned-Contractor Operated Munitions Facilities: Are They Appropriate in the Age of Strict Environmental Compliance and Liability?*, 131 MILITARY LAW REVIEW 39 n.262 (1991). It is undisputed that there were persons at the plant who were repeatedly exposed to Sodium Dichromate powder in the soil and in other areas of the plant over a period of time through touch or inhalation. We believe that this exposure is consistent with the term "nonsudden release" of a toxic or

10

hazardous substance in accordance with Enclosure A of the White Memo in the contract.

Based upon the above, we believe that appellant has shown an "unusually hazardous risk" to which indemnification applies under the Indemnification clause. We also believe that, per Paragraph (c) of the clause, the loss for which appellant seeks indemnification "arises out of" or "results from" that risk. The parties' motion papers also do not dispute that such loss was "not compensated for by insurance or otherwise," per Paragraph (c) of the clause, and we so conclude.

Accordingly, we conclude that appellant has met the requirements of Paragraphs (b) and (c) of the Indemnification clause for purposes of obtaining indemnification under the clause.

## Per Paragraph (d) of the Indemnification clause, Willful Misconduct or Lack of Good Faith of the Contractor Does Not Bar Indemnification of the Costs Claimed.

The government contends that it did not intend under the Indemnification clause to indemnify appellant for third-party claims and related litigation costs attributable to appellant's own misconduct, and spends much of its opposition citing to the evidence of record supporting this alleged misconduct (gov't opp'n at 31-37).[5] The government's contention, however, is not supported by the language of the Indemnification clause. Paragraph (d) of the clause expressly addresses claims or losses "caused by willful misconduct or lack of good faith" of the contractor. Under such circumstances, said paragraph bars indemnification of costs incident to "Government claims against the Contractor" or for "Loss or damage affecting the Contractor's property." It does not bar the indemnification of third-party claims against appellant and related legal costs. To the same effect is EO 10789 as amended (SOF ¶ 4). Hence, assuming, *arguendo*, that there was some element of misconduct by KBRSI here, such misconduct does not bar indemnification of the covered losses arising from these third-party actions.

We have considered all the government's arguments regarding the interpretation of the Indemnification clause and otherwise. We conclude that the Indemnification clause – and the related White Memo and Enclosure A – are unambiguous, and that the plain language of these contract provisions support

---

[5] For example, the jury in *Bixby* found appellant liable for compensatory and punitive damages and the trial court, in response to post-trial motions, found that appellant, *inter alia*, affirmatively concealed the risks of exposure to Sodium Dichromate to the plaintiffs (gov't opp'n at 29-31). The Ninth Circuit vacated this judgment on jurisdictional grounds (*see* SOF ¶ 19).

appellant's entitlement to indemnification as a matter of law under the circumstances presented.

## CONCLUSION

Appellant's motion for partial summary judgment under Count III of its complaint, seeking entitlement to indemnification pursuant to Public Law No. 85-804 and the Indemnification clause, is granted consistent with this opinion.

Dated: 13 August 2015

JACK DELMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59357, 59358, Appeals of Kellogg Brown & Root Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

12

APPENDIX

## 52.250-1 Indemnification Under Public Law 85-804.

As prescribed in 50.403-3, insert the following clause in contracts whenever the approving official determines that the contractor shall be indemnified against unusually hazardous or nuclear risks (also see 50.403-2(c)):

INDEMNIFICATION UNDER PUBLIC LAW 85-804 (APR 1984)

(a) "Contractor's principal officials," as used in this clause, means directors, officers, managers, superintendents, or other representatives supervising or directing—

(1) All or substantially all of the Contractor's business;

(2) All or substantially all of the Contractor's operations at any one plant or separate location in which this contract is being performed; or

(3) A separate and complete major industrial operation in connection with the performance of this contract.

(b) Under Public Law 85-804 (50 U.S.C. 1431-1435) and Executive Order 10789, as amended, and regardless of any other provisions of this contract, the Government shall, subject to the limitations contained in the other paragraphs of this clause, indemnify the Contractor against—

(1) Claims (including reasonable expenses of litigation or settlement) by third persons (including employees of the Contractor) for death; personal injury; or loss of, damage to, or loss of use of property;

(2) Loss of, damage to, or loss of use of Contractor property, excluding loss of profit; and

(3) Loss of, damage to, or loss of use of Government property, excluding loss of profit.

(c) This indemnification applies only to the extent that the claim, loss, or damage (1) arises out of or results from a risk defined in this contract as unusually hazardous or nuclear and (2) is not compensated for by insurance or otherwise. Any such claim, loss, or damage, to the extent that it is within the deductible amounts of the Contractor's insurance, is not covered under this clause. If insurance coverage or other financial protection in effect on the date the approving official authorizes use of

this clause is reduced, the Government's liability under this clause shall not increase as a result.

(d) When the claim, loss, or damage is caused by willful misconduct or lack of good faith on the part of any of the Contractor's principal officials, the Contractor shall not be indemnified for—

(1) Government claims against the Contractor (other than those arising through subrogation); or

(2) Loss or damage affecting the Contractor's property.

....

(f) The rights and obligations of the parties under this clause shall survive this contract's termination, expiration, or completion. The Government shall make no payment under this clause unless the agency head determines that the amount is just and reasonable. The Government may pay the Contractor or subcontractors, or may directly pay parties to whom the Contractor or subcontractors may be liable.

(g) The Contractor shall—

(1) Promptly notify the Contracting Officer of any claim or action against, or any loss by, the Contractor or any subcontractors that may reasonably be expected to involve indemnification under this clause;

(2) Immediately furnish to the Government copies of all pertinent papers the Contractor receives;

(3) Furnish evidence or proof of any claim, loss, or damage covered by this clause in the manner and form the Government requires; and

(4) Comply with the Government's directions and execute any authorizations required in connection with settlement or defense of claims or actions.

(h) The Government may direct, control, or assist in settling or defending any claim or action that may involve indemnification under this clause.

(End of clause)

*Alternate I (APR 1984).* In cost-reimbursement contracts, add the following paragraph (i) to the basic clause:

2

(i)  The cost of insurance (including self-insurance programs) covering a risk defined in this contract as unusually hazardous or nuclear shall not be reimbursed except to the extent that the Contracting Officer has required or approved this insurance.  The Government's obligations under this clause are—

(1)  Excepted from the release required under this contract's clause relating to allowable cost; and

(2)  Not affected by this contract's Limitation of Cost or Limitation of Funds clause.